We'll hear argument next in No. 20-1448, Alcona, Inc. v. VF Outdoor, LLC. Mr. Jack. Yes, Your Honor. May it please the Court, the Board's final written decision below should be reversed for a number of reasons. First, the Board improperly construed the terms active particles, first thickness, and second thickness. The Board's determinations of anticipation by the Dutta and Haley references were predicated on those flawed claim constructions. Moving forward to the term active particles, which is critical to a number of issues in this case, the broadest reasonable construction of active particles is particles that adsorb or trap substances on their surface. This construction is supported by the weight of the intrinsic record, which makes clear that active particles are surface active, adsorbent with a D, particles. However, the Board's construction is unreasonably broad in this case and encompasses virtually any particle and any reaction type. The Board confirmed as much on page 9 of the final written decision, that is appendix page 9, where it stated that active particles encompass, and I quote, a variety of different mechanisms and are not merely particles that adsorb or trap substances on their surface. The Board's construction for active particles is incorrect for a number of reasons. First, the Board committed legal error by the turning of the inventor, Dr. Hadquist, active as his own lexicographer for active particles. The Board did not perform the proper analysis. It did not identify the ordinary meaning of active particles or did not explain how the inventor was using that term, excuse me, in a way that was different from its ordinary meaning. Also, the Board did not identify a language of definitional intent. The inventor, Dr. Hadquist, did not define active particles in the specification with reasonable clarity, deliberateness, and precision as is required. But perhaps more importantly, the Board's alleged definitional phrase for active particles omits critical language from the sentence chosen in the specification. The Board chose its definition, a sentence from column 4, starting at line 6 in the patent, that's appendix page 65, but in its alleged definition, it omitted the first two critical words of the phrase. And those words were surface active. This entire patent is about surface active particles. It is about the surface process of adsorption with a D. So even assuming, for purposes of argument, that Dr. Hadquist had in fact sought to define the term active particles in the specification, the Board can't pick part of that definition as the inventor's definition of that term. Omitting the phrase surface active is a clear reversible error, even assuming, again, that he was trying to define the term in the specification. To the extent that this body determines that the inventor was actually defining that term, I would submit that the definition at least has to correspond to what the inventor actually said. What the inventor actually said is that active particles are surface active particles, not just any particles, but surface active. And the Board's definition is also disconnected from the weight of the evidence in this case, which repeatedly makes clear that in this patent and the rest of the records, active particles are surface active particles. They work by the surface active process of adsorption. Counsel, this is Judge Moore. You are hinging a lot on the column four inclusion of the word surface before the word active particles to limit it to adsorption or trapping because those things occur at the surface. Is that right? That is correct, Your Honor. And you want to exclude adsorption because that doesn't include at the surface, right? AB as opposed to AD. Is that right? Correct. That is correct. And it's very confusing when you're writing it and speaking about it. But, yes, you're correct. Active particles. One concern I have, though, Counsel, is that the claims at issue don't talk about surface active particles. They talk about active particles. And active particles would include adsorption as well as adsorption. That's a great question, Your Honor. If you look starting on column four, line four, where the paragraph starts, and I'll quote, the specification says, these particles may provide such properties because they are active. That is, the surface of these particles may be active. End quote. So I would submit, Your Honor, respectfully, that active in the context of this patent means surface active. That also directs your attention. But, Counsel, but this patent, and, in fact, many claims within it, even cover materials like baking soda and silica, which are absorbing as opposed to adsorbing materials. Is that right? No, Your Honor. Respectfully, as we explain in our papers and our expert testimony cited therein, a person of ordinary skill in the art would understand that when it references these compounds that, for example, silica, that they would be activated in this patent, that they would be active versions of those compounds. And we cite to extrinsic evidence, Rosado's dictionary, I believe, which is consistent with our expert testimony, that active in this context means activation. It means processing a substance with heat and other chemicals to generate the high porosity needed. So, for example, carbon is the perfect example, Your Honor. Just plain carbon is not an active particle. It has to be processed. It has to be activated. And so we submit, Your Honor, that in this patent, because it's infused with the discussion of surface action, of porosity, of adsorption, that the active particles here have to be processed, have to be made active. And so to answer your question, Your Honor, when it recites some of these other compounds, a person of ordinary skill would understand that that's referring to an activated version of that compound. But didn't... I'm sorry, but didn't the board have in front of it the Daniels Declaration, which admitted that the silica can act through adsorption? And, you know, I mean, our standard of review here is substantial evidence for something like this because we're now outside of the intrinsic record. And so doesn't that matter? If I recall, Your Honor, I think one of our experts, I think it may have been Daniels, stated that, for example, when you're talking about silica gel in this patent, it would have to be an activated version to be a surface active particle. But I think, Your Honor, you're talking about a question of fact. I think the underlying issue here is that the claim construction of active particles is incorrect. And so at a minimum, the decision should be remanded, if not reversed, so that the board can apply the appropriate definition of active particles to the record evidence. Okay. Are you going to save your rebuttal time? Yes, Your Honor. Unless there are any further questions, I'll save the remainder of my time for rebuttal. Thank you. Okay. Mr. Gergely? May it please the Court, Peter Gergely for VF Outdoor LLC. Your Honor, these inventions have been known in the prior art for years, at least 10 years before the patent suit was applied for. Not surprisingly, the technology was invented by inventors at W.L. Gore and disclosed in the Dutta and Haley references. Kokona seeks to avoid these prior art references by seeking overly narrow claim constructions of active particles, first thickness and second thickness. Regarding active particles, Kokona seeks to modify the term with the word surface, which appears in the specification, but the specification is not so narrow. It describes active particles as those that... Counsel, is it your view, though, that if the claim said surface active, as opposed to just active particles, if it said surface active particles, then it would have been reasonable for the board to have limited it to adsorption or trapping substances at that point? It's hard for me to predict what the board would have done in that case because that wasn't the issue in front of them, but I would agree with you that the argument may hold more weight if the claim term was actually surface active particles, but it wasn't. It was broader. It was active particles. And I would also note that the passage that counsel relies on in column four, line four, it says the surface of these particles may be active, so it doesn't require the surface to be active. It just says they may be active. Have I answered your question? Sure. And, again, the issue here is what is the broadest reasonable interpretation in light of the specification? And the specification describes active particles in terms of their functional properties, which includes moisture management, UV protection, and chemical protection. It also describes active particles as having a number of mechanisms of action, including odor absorption and light absorption. And, Your Honor, you did note that certain absorbing particles were disclosed in the specification, such as baking soda and silica gel, and there was a key admission from Kokona's expert, Mr. Daniels, or Dr. Daniels, where he opines that silica gel, which is defined as an active particle in the specification, can, in fact, absorb water. So the definition in the specification with respect to active particles is not so narrow as Kokona would advance. Could we turn to your cross-appeal in Claims 38 and 39? Yes. Now... Is your theory here that, by incorporating Claim 27, that this MTBR measurement should be taken after the de-encapsulating? Is that what your theory is? Yes, and I think that's a fair reading of Claims 38 and 39, which really speak... They speak to encapsulated particles, and when these particles are encapsulated, they are in a deactivated state. So, by definition, they're not going to have the MDTR enhancing properties. It's only when that is removed that an improvement in MDTR occurs. That's just... But Claims 38 and 39 don't require the complete removal of the encapsulation, but only the removal of some encapsulations. So, if that's true, how does the record then show that Haley establishes that that limitation is satisfied in the combination? Well, in Haley, it actually shows that the MDTR limitation is met when there are no active particles present whatsoever. So, a person of ordinary skill in the art would reasonably assume, would have a reasonable expectation of success that when you add active particles to Haley or Dutta, and they are unencapsulated, you would get an improvement. Well, how does Haley show that the limitation would be met if there are no active particles? Your Honor, if you actually look at the table in Haley, if you just give me a moment, I believe we excerpted it in our brief. Okay. Is this at 759? Is that one of those? I'm sorry, I'm not following 759. Oh, actually, I'm looking at page four of our brief. Yes, 759. And if you look at the control, the control has no active particles present. So, there the MDTR is 6344 grams per meter squared per day. So, that actually has a material that already meets the claimed MDTR limitation. So, the argument would be when you put unencapsulated particles in combination with that material, you're going to get an improvement. But don't the claims suggest that the active particles have to meet the MTVR limitation? I'm sorry, Your Honor. I didn't hear that part. Don't claims 38 and 39 suggest that the active particles have to meet the MTVR limitation? Right. For example, we were looking at Appendix 759, which is excerpted on page four of our brief. If you look at examples one, two, and three, that shows the improvement. And in that particular example, those are unencapsulated particles. The 7736 and the 6924 are all within range, and they're all an improvement over control. I thought you said those weren't active particles. Am I misunderstanding? Yes. The control has no active particles in it, and that shows that the MVTR range is already met. In examples one, two, and three, those are the test cases where the active particles are added. And in this case, that's the black pearls. And that shows an improvement over control from 6344 up to 7736 twice, and then once to 6924. So there's an improvement, and it's also within the claim range. And those are unencapsulated particles. Okay. I understand what you're saying, but I'm not understanding how you can rely on the control to satisfy this claim limitation when the claims seem to require that the active particle satisfy the claim limitation. Right. And so the argument we are advancing is that if you encapsulate these particles and then remove the encapsulant, you would get what's shown in the test cases one, two, and three. A person of ordinary skill in the art would reasonably expect that. You're right. When you're combining Hagquist with either Haley or Dutta. Wait. But your problem is that the claims only require the removal of some of the encapsulant, not all of it, right? Correct. And I think that's open-ended. It could be some, and it could be all. Okay. Go ahead. So the issue we have with the board's construction with respect to 38 and 39 is they said that there's no evidence of how these claim limitations would be met when the particles are encapsulated. But that's not what claims 38 and 39 are directed to. They are directed to particles that are encapsulated. And they have the capability to meet that MVTR limitation when the removable encapsulant is removed to reactivate at least a portion of the active particles. So it really speaks to future actions. These particles are, in fact, encapsulated. But the measurement is not done until that encapsulant is removed. So what you're measuring is unencapsulated particles. And that's where I think the board got it wrong, is that they were suggesting that the particles actually had to be encapsulated in order to achieve this MVTR limitation. And that's inconsistent with the specification.  Do you want to save your rebuttal, Tom? I will. Thank you, Your Honor. Okay. Mr. Jackson? Yes, Your Honor. I would like to briefly address VF's cross-appeal arguments that we were just discussing. The board correctly determined that claims 38 and 39 are not obvious over two combinations, Dutta and Hagquist and Haley and Hagquist. And the board correctly pointed out both in the final written decision and in its decision denying the rehearing request at Appendix 653 and 654, correctly pointed out that Petitioner VF did not show that the MVTR of underlying Claim 27 was ever met. And Claim 27 is the independent. And would it be met if you had removed all the encapsulant and made the claim after that removal? I don't think there is evidence in the record to show that, Your Honor, because what they failed to show and what the board identified in its papers and during the hearing was that there's simply not evidence in the record showing that the combination would result in the claimed range. I understand why the Petitioner is focusing on the tables and Haley, but that's not the end of the inquiry. The correct question is, what is the MVTR when the Hagquist particles are substituted into Haley? The Hagquist particles are different than Haley's particles, and there's simply no evidence showing how that works. There's no evidence showing that the MVTR of Claim 27 is met, and there's no evidence showing what happens when those particles are substituted into Haley. Okay, anything further? Let me see. Yes, Your Honor, one quick point. I did want to circle back and agree with some of the comments I believe you were making earlier. The active particles in Claim 27 have to contribute to the moisture vapor transmission rate. It's not just the rate of a sheet or layer of plastic or other material, but the active particles and their surface activity is responsible for the improved MVTR. And with that, Your Honor, we will rest our case today. Thank you. Okay. Mr. Jackson, Mr. Gerkley, you have a couple of minutes. Yes, Your Honor, I'd like to focus on Claims 38 and 39 in our cross-appeal. Counsel said that our argument was that the Hagquist particles had to be substituted into Haley or Dutta. That's not the argument we're making on appeal. We're arguing that the encapsulants of Hagquist would be used with either Haley or Dutta. So that's different. It's not a wholesale swapping out of particles. It's just simply that the encapsulants would be used and then removed. And then with respect to this issue of removing a portion of the activity, where at least a portion of the active particles would be improved, it says at least a portion. So I read that as meaning it can be at least a portion or it could be the entire portion of the particles could be reactivated to improve the composition. The issue we have with the Board's ruling on these claims is that it was an improper claim construction. They required that encapsulant to be present at all times, including the measurement of the MVTR, and we think that's just incorrect based on the specification. This claim and the specification speaks to encapsulated particles that would have the ability to improve MVTR upon removal of the encapsulant. So it speaks to particles that have that capability. The measurement is not done when the particles are encapsulated. The measurement is done when that encapsulant is removed. And unless Your Honor has any questions, we would rest. Okay. Thank you, Mr. Gurgley. Thank you, Mr. Jackson. The case is submitted. Thank you.